FILED
2025 Mar-24  AM 08:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

**S UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | | |
|---|---|---|
| **LORI WADE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 6:23-cv-00082-MHH** |
| | } | |
| **LELAND DUDEK, ACTING** | } | |
| **COMMISSIONER OF SOCIAL** | } | |
| **SECURITY,**[1] | } | |
| | } | |
| **Defendant.** | } | |

**MEMORADUM OPINION**

Lori Wade has asked the Court to review a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Wade's claims for a period of disability and disability insurance benefits based on the Administrative Law Judge's finding that Ms. Wade was not disabled. Ms. Wade argues that the Administrative Law Judge—the ALJ—did not properly apply the Eleventh Circuit's pain standard. Ms. Wade also argues that the ALJ did not properly evaluate the opinion of the consultative medical examiner. After careful review of the

---

[1] On February 17, 2025, Leland Dudek became the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Commissioner Dudek as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (Although the public officer's "successor is automatically substituted as a party" when the predecessor no longer holds office, the "court may order substitution at any time. . . .").

administrative record, for the reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Wade had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[2]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[2]  Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." *See* https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited Oct. 18, 2024).

can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Ms. Wade applied for a period of disability and disability insurance benefits on November 12, 2020. (Doc. 6-6, p. 9). Ms. Wade alleged that her disability began on December 16, 2019. (Doc. 6-6, p. 9). The Social Security Commissioner initially denied Ms. Wade's claims, and Ms. Wade requested a hearing before an Administrative Law Judge. (Doc. 6-5, pp. 9, 13, 19). Ms. Wade and her attorney attended a telephone hearing with an ALJ on June 21, 2022. (Doc. 6-3, p. 48). A vocational expert testified at the hearing. (Doc. 6-3, pp. 82-90).

The ALJ issued an unfavorable decision on August 3, 2022. (Doc. 6-3, pp. 16-31). On November, 18, 2022, the Appeals Council declined Ms. Wade's request for review, (Doc. 6-3, p. 2), making the Commissioner's decision final and thus a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Wade's Medical Records*

To support her application, Ms. Wade relied on medical records relating to the treatment and diagnoses of degenerative disc disease of the cervical, thoracic, and lumbar spine; polyneuropathy of the lower extremities; fibromyalgia; paresthesia of the legs; hypertension; obesity; depressive disorder; a neurocognitive disorder; and chronic fatigue.[3]    The Court has reviewed Ms. Wade's complete medical history and summarizes the following medical records because they are most relevant to the Court's decision in this appeal.

---

[3] "Degenerative disc disease occurs when the cushioning in [the] spine begins to wear away.  The condition is most common in older adults.  After age 40, most people experience some spinal degeneration.  The right treatment can lead to pain relief and increased mobility. . . .  When the cushions wear away, the bones can start to rub together.  This contact can cause pain and other problems, such as . . . spinal stenosis, when the spaces around [the] spine narrow[,] [and] spondylolisthesis, when vertebrae move in and out of place." *See* https://my.clevelandclinic.org/health/diseases/16912-degenerative-disk-disease (last visited Oct. 18, 2024).

"Polyneuropathy is when multiple peripheral nerves become damaged.  Symptoms include problems with sensation, coordination, or other body functions." *See* https://www.medicalnewstoday.com/articles/317212#:~:text= Polyneuropathy%20is%20when%20multiple%20peripheral,the%20brain%20and%20spinal%20 cord (last visited Oct. 18, 2024).

"Fibromyalgia is a type of arthritis that causes pain, fatigue, emotional and mental distress, and sleep problems.  There is no cure, but you can manage it with self-care, therapies, and medicines." *See* https://www.cdc.gov/arthritis/fibromyalgia/?CDC_AAref_Val=https://www.cdc.gov/arthritis/typ es/fibromyalgia.htm (last visited Oct. 18, 2024).

On December 18, 2019, Ms. Wade saw Dr. Terry James at Addison Medical Clinic and complained of mid-to-lower back pain after starting a new job. (Doc. 6-12, p. 75).[4] Ms. Wade requested pain medication. (Doc. 6-12, p. 75). Dr. James noted that Ms. Wade weighed 183 pounds. (Doc. 6-12, p. 75). Dr. James prescribed Toradol and Flexeril for pain. (Doc. 6-12, p. 75). At a visit with Dr. James on December 30, 2019, Ms. Wade reported that she had hurt her back at work two weeks earlier picking up a 50-pound bag and that her pain was not better. (Doc. 6-12, p. 74). Ms. Wade complained of "stabbing" pain in her back and "heat or tingling" and weakness in her legs. (Doc. 6-12, p. 74). Dr. James ordered an x-ray of her back, prescribed Norco for pain, and referred Ms. Wade to an orthopedist. (Doc. 6-12, p. 74). On January 6, 2020, Dr. James noted that Ms. Wade had lumbar spasms. (Doc. 6-12, p. 73). Dr. James noted that Ms. Wade had an appointment with Dr. Prevost on January 22, 2020 for a possible MRI. (Doc. 6-12, p. 73).

On January 22, 2020, Ms. Wade saw Dr. Mark Prevost at Southern Orthopedic & Sports Medicine. (Doc. 6-8, p. 29). Ms. Wade reported that her back pain began in July 2019, and she saw a chiropractor with "great improvement." (Doc. 6-8, p. 29). She indicated that her back pain returned when she started a new job in November 2019 and lifted 50-pound bags. (Doc. 6-8, p. 29). Ms. Wade complained of significant pressure and pain in her lower back; bilateral hip, groin, and leg pain;

---

[4] Dr. James's medical notes are handwritten and difficult to decipher.

weakness in her legs; and increased pain standing, doing housework, and lifting. (Doc. 6-8, p. 29). Her pain ranged from a 2/10 to an 8/10 on the pain scale. (Doc. 6-8, p. 29).

Dr. Prevost's physical examination showed that Ms. Wade had decreased range of motion in her lumbar spine; 5/5 motor strength in her hips, knees, and feet; normal reflexes; intact sensation; and negative straight leg raise tests. (Doc. 6-8, p. 30). A lumbar spine x-ray showed that Ms. Wade had "spondylolisthesis at L3-4 with motion on flexion extension" and "retrolisthesis at L4-5 [] that correct[ed] on flexion consistent with instability at those levels." (Doc. 6-8, p. 30).[5] An MRI of Ms. Wade's lumbar spine showed "[d]egenerative disc disease manifested by disc desiccation, narrowing of the disc space, [] endplate changes," "4 mm of spondylolisthesis, facet arthropathy, and mild to moderate foraminal stenosis" at L3-4; the MRI revealed disc desiccation, "[b]road based disc bulge," "mild central canal

---

[5] "Spondylolisthesis happens when one of the bones in [the] spine ([the] vertebrae) slips out of alignment and presses down on the vertebra below it. Many people can manage symptoms like pain and stiffness without surgery. But [the] provider will suggest surgical repair if the slip is a high grade or nonsurgical treatments don't help." Symptoms of spondylolisthesis include lower back pain and stiffness, leg pain, "difficulty walking or standing for more than a few minutes a time," and numbness or tingling in the feet. *See* https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis (last visited Oct. 18, 2024).

"Lumbar retrolisthesis is when parts of [the] backbone are slipping backwards on one another. Although this condition generally causes few symptoms, there's evidence that lumbar retrolisthesis can lead to back pain and impaired back function." Bulging spinal discs can contributed to lumbar retrolisthesis. *See* https://www.webmd.com/back-pain/what-is-lumbar-retrolisthesis (last visited Oct. 18, 2024).

stenosis in conjunction with facet arthropathy and ligament hypertrophy," and "[m]ild-to-moderate bilateral foraminal stenosis" at L4-5. (Doc. 6-9, p. 14; *see* Doc. 6-8, p. 32).[6] Dr. Prevost diagnosed Ms. Wade with lumbar stenosis, spondylosis, and spondylolisthesis at L3-4 and retrolisthesis at L4-5 with instability. (Doc. 6-8, p. 30; Doc. 6-9, p. 13). Dr. Prevost recommended three lumbar epidural steroid injections and physical therapy. (Doc. 6-8, p. 32). Dr. Prevost wrote that he would "keep [Ms. Wade] off work until . . . her first block and then put her on light duty" if her employer had light duty. (Doc. 6-8, p. 32). Dr. Prevost noted that Ms. Wade could not lift, push, or pull greater than 15 pounds and would need to change positions frequently. (Doc. 6-8, p. 32).

On February 10, 2020, Ms. Wade began physical therapy with PT Dean McIntosh at Drayer Physical Therapy. (Doc. 6-9, p. 137). Ms. Wade complained of lower back pain that radiated to her right leg and rated her pain at 4/10. (Doc. 6-9, p. 137). Ms. Wade reported that a cow had kicked her right leg several years

---

[6] "Disc desiccation occurs when the tissues of the discs between the vertebrae become dehydrated. They may heal on their own, or surgery may be required to treat it. . . . [L]umbar disc desiccation will cause pain in the lower back" and may cause stiffness, weakness, numbness in the legs or feet, and reduced or painful movement. *See* https://www.medicalnewstoday.com/articles/322121#symptoms (last visited Oct. 18, 2024).

"Foraminal stenosis is a condition that happens when narrowing in parts of [the] spine causes compression of [the] spinal nerves. Most cases don't cause symptoms, even with severe narrowing. However, when there are symptoms, pain and nerve-related issues can happen. There are many possible treatments, ranging from rest and physical therapy to surgery." *See* https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis (Last visited Oct. 18, 2024).

earlier, and PT McIntosh noted that Ms. Wade's right leg was more swollen than her left.  (Doc. 6-9, p. 137, 139).  Ms. Wade reported a moderate decrease in her "functional/ADL status" because of her back pain -- she had difficulty moving in bed, carrying, lifting, climbing stairs, and bending.  (Doc. 6-9, p. 139).  Ms. Wade had decreased lumbar range of motion, decreased extremity strength, and weakness in her core and hips.  (Doc. 6-9, pp. 138-39).  PT McIntosh noted that Ms. Wade needed physical therapy three times a week for four weeks and that therapy would focus on "improved lumbar mobility and strength as well as core stability and reduction of radicular pain."  (Doc. 6-9, p. 140).  PT McIntosh wrote that Ms. Wade's "rehab potential was excellent."  (Doc. 6-9, p. 139).

At a February 12, 2020 physical therapy visit, Ms. Wade rated her pain at 5/10 and complained of hip pain.  (Doc. 6-9, p. 134).  PTA Amy Crowe noted that Ms. Wade had pain performing exercises, that her progress and tolerance for treatment were fair, and that therapy "should focus on core strengthening and posture" to reduce pain.  (Doc. 6-9, p. 135).[7]  Ms. Wade reported her pain at 7/10 at a visit on February 13, 2020 and stated that she was "out of medicine."  (Doc. 6-9, p. 131).  By

---

[7] "A Physical Therapist Assistant (PTA) is an educated, skilled, and licensed health care worker. Under the direction and supervision of a physical therapist, the PTA helps people of all ages who have health conditions that limit their ability to move and perform functional activities in their daily lives."  *See* https://calhoun.edu/wp-content/uploads/2021/03/PTA-FAQ.pdf  (Last visited Sept. 21, 2024).  PTA Crowe was under the supervision of PT Judy Gazdag and Dean McIntosh. (Doc. 6-9, pp. 109, 113).

a February 17, 2020 visit, Ms. Wade reported a pain level at 3/10, and she stated that she could "walk around on a trail." (Doc. 6-9, p. 128).

At a visit with Dr. James on February 17, 2020, Ms. Wade complained of lower back pain. (Doc. 6-12, p. 71). Dr. James noted that Dr. Prevost recommended surgery if Ms. Wade was not better after physical therapy. (Doc. 6-12, p. 71). Ms. Wade received her first epidural steroid injection on February 18, 2020. (Doc. 6-8, pp. 10-11). Before the procedure, Ms. Wade complained of pain "across her mid lumbar region" that radiated "around her groin bilaterally." (Doc. 6-8, p. 11).

Ms. Wade returned to PTA Crowe for physical therapy on February 20, 2020 and reported "pain with bending backwards." She rated the pain at 3/10. (Doc. 6-9, pp. 125-26). PTA Crowe noted that Ms. Wade had some difficulty performing exercises, but her progress and tolerance to treatment were good. (Doc. 6-9, p. 126). On February 21, 2020, Ms. Wade rated her pain at 2/10 during physical therapy but stated that her pain had been worse in the morning. (Doc. 6-9, p. 121). By a February 24, 2020 visit, Ms. Wade reported "feeling better" and rated her pain at 2/10. (Doc. 6-9, p. 118). Ms. Wade's pain increased to 3/10 at a February 26, 2020 visit. (Doc. 6-9, p. 114).

On February 27, 2020, Ms. Wade saw Dr. John Bivona at Jasper Family Practice. (Doc. 6-13, p. 8). Ms. Wade complained of severe lower back pain that radiated to her neck and down both legs. (Doc. 6-13, p. 8). Ms. Wade indicated that

she was "better with pain meds." (Doc. 6-13, p. 8). Dr. Bivona noted in the "Review of Systems" section of Ms. Wade's record that she did not have swelling in her joints or muscle weakness. (Doc. 6-13, p. 9). Ms. Wade had normal range of motion but tenderness to palpation in her cervical and lumbar spine; cervical, thoracic, and lumbar paraspinal muscle hypertonicity; bilateral SI joint tenderness; an "irregular and antalgic gait"; and more than 11 "tender trigger points located diffusely across the muscles of the back, neck, shoulders, and proximal extremities." (Doc. 6-13, pp. 9-10).[8]    X-rays showed "mild degenerative change and generalized interspace narrowing" in her thoracic spine; "mild generalized interspace narrowing" and "degenerative change with reversal of the normal lordosis" in her cervical spine; and mild scoliosis, mild-to-moderate interspace narrowing, "Grade 1 spondylolisthesis of L3 on L4 by 10 mm," "possible L3 pars defect," and "2mm retrolisthesis of L4 on L5" in her lumbar spine. (Doc. 6-13, pp. 107-09).[9] Dr. Bivona diagnosed back

---

[8] Muscle hypertonicity is the "abnormal increase in muscle tone as a result of upper motor neuron lesions" that can cause spasticity and rigidity. "Treatment options include stretching, strengthening, positioning, oral medications, botulinum toxin injections, phenol injections, as well as surgical procedures. Without effective management, hypertonia can result in muscle imbalance, abnormal movement patterns, pain, joint contracture, joint deformity, and ultimately negatively impact a patient's function." *See* https://pubmed.ncbi.nlm.nih.gov/28716516/ (last visited Oct. 18, 2024).

[9] "A pars defect or spondylolysis is a stress fracture of the bones of the lower spine. These fractures typically occur due to overuse. They can be on one or both sides of the vertebrae. It is a common cause of low back pain in children and adolescents. The most common cause of low back pain is muscular, secondary to overuse and deconditioning. *See* https://www.ortho.wustl.edu/content/Patient-Care/6884/Services/Pediatric-and-Adolescent-Orthopedic-Surgery/Overview/Pediatric-Spine-Patient-Education-Overview/SpondylolysisPars-Defect.aspx (last visited Oct. 18, 2024).

pain, neck pain, malaise, and myalgia. (Doc. 6-13, p. 12). Dr. Bivona prescribed Lyrica for radiculopathy, Cymbalta for "malaise," Robaxin for muscle spasms, and Norco for pain. (Doc. 6-13, p. 12). Dr. Bivona recommended rest, heat, and passive stretching. (Doc. 6-13, p. 11).

At a February 28, 2020 visit with PTA Crowe, Ms. Wade rated her pain at 3/10 and reported increased pain when she cleaned the kitchen and washed dishes. (Doc. 6-9, p. 110). PTA Crowe noted that Ms. Wade had difficulty performing activities because of pain. (Doc. 6-9, p. 111). On March 2, 2020, Ms. Wade reported her pain at 2/10 and indicated she could do "some housework." (Doc. 6-9, p. 107). At a visit with PTA Crowe on March 3, 2020, Ms. Wade complained of pain in her back that radiated to her right leg and numbness in her right toe. (Doc. 6-9, p. 102). Ms. Wade reported that caring for her grandchild increased her back pain. (Doc. 6-9, p. 102). Ms. Wade reported "minimal difficulty" performing "[f]unctional ADLs" and stated that she could "do stuff at home but ha[d] to rest." (Doc. 6-9, p. 102). Ms. Wade had increased flexibility and rotation in her lumbar spine and increased strength in her hips and knees. (Doc. 6-9, pp. 102-03). On March 4, 2020, Ms. Wade rated her pain at 2/10 and reported soreness likely from therapy three days in a row. (Doc. 6-9, p. 98).

Ms. Wade received her second epidural steroid injection on March 5, 2020. (Doc. 6-8, p. 41). Ms. Wade rated her pain at 2/10 before and after the procedure.

(Doc. 6-8, pp. 42, 46).  Ms. Wade reported "40% relief" after the first injection. (Doc. 6-8, p. 42).  On March 11, 2020, Ms. Wade told Dr. Bivona that her back pain was worse with activity.  (Doc. 6-13, p. 14).  Ms. Wade had a normal gait.  (Doc. 6-13, p. 15).

At visits with PTA Crowe on March 11 and 12, 2020, Ms. Wade did not report pain.  (Doc. 6-9, pp. 92, 95).  At the March 11 visit, Ms. Wade reported that she had to pick up her 25-pound grandchild for safety reasons and "had a cold, wet feeling in left hip, which went away with rest."  (Doc. 6-9, p. 95).  Ms. Wade stated that she was distracted during therapy and had difficulty understanding what PTA Crowe "asked during treatment," but Ms. Wade could perform the exercises at a slow pace. (Doc. 6-9, p. 96).  At the March 12 visit, Ms. Wade reported weakness in her legs "after using the stepper" during therapy, but she performed all exercises.  (Doc. 6-9, pp. 92-93).  By a March 13 visit with PTA Crowe, Ms. Wade reported increased pain at 3/10 and stated that "her back [was] hurting more" that day.  (Doc. 6-9, p. 88).  Ms. Wade completed all exercises, and PTA Crowe noted Ms. Wade's progress; her tolerance to treatment was "good."  (Doc. 6-9, p. 89).  At a March 16, 2020 visit with PTA Crowe, Ms. Wade had no pain, reported good tolerance to all exercise, and stated that she was not having problems.  (Doc. 6-9, p. 84).  Ms. Wade reported pain at 2/10 at a March 31, 2020 visit and stated that she had cleaned flower beds. (Doc. 6-9, p. 80).

Ms. Wade saw PT Tyler Hudgins and PTA Crowe on April 1, 2020 and reported pain at 3/10. (Doc. 6-9, p. 73). Ms. Wade reported continued back pain that fluctuated between a 2/10 and 6/10 with functional activity and the inability to stand longer than 30 minutes before she needed to sit down. (Doc. 6-9, pp. 73-74, 77). Ms. Wade had a FOTO score of 52/100. (Doc. 6-9, p. 73).[10] PT Hudgins noted that Ms. Wade could walk without pain and could squat but had pain doing so. (Doc. 6-9, pp. 73-74). Ms. Wade reported to PTA Crowe that she had "pain with prolonged sitting, walking, and standing;" had minimal difficulty with her functional ADLs; and could "perform ADL[s] but with modified changes due to pain." (Doc. 6-9, pp. 75, 77). Ms. Wade decided to stop attending physical therapy. PT Hudgins noted that Ms. Wade's progress and tolerance to treatment were good and that her discharge prognosis was good. (Doc. 6-9, p. 73). Ms. Wade had completed 17 of 21 PT appointments from February to April 2020. (Doc. 6-9, p. 77).

An April 17, 2020 CT scan of Ms. Wade's pelvis showed "[g]rade 1 anterolisthesis of L3 and L4 associated with bilateral spondylolisthesis resulting and moderate bilateral L3-4 neural foraminal stenosis." (Doc. 6-11, pp. 12, 14).[11] Ms.

---

[10] A Focus on Therapeutic Outcomes (FOTO) score measures physical functional status on a scale of 0 to 100, with higher scores indicating better functional status. *See* https://fotoinc.com/wp-content/uploads/2023/02/Primary-Measures-in-FOTO-Jan-2023.pdf (last visited Oct. 18, 2024).

[11] "Anterolisthesis is an abnormal alignment of bones in the spine and usually affects the lower back. It occurs when an upper vertebra slips forward on the one below, leading to pain and other symptoms. . . Misaligned vertebrae can pinch the nerves, and this can have painful and debilitating consequences." *See*

Wade had a telemedicine visit with Dr. Bivona on May 5, 2020 and reported severe lower back pain radiating to her neck and legs. (Doc. 6-13, p. 22). Ms. Wade reported that she was "better with pain meds." (Doc. 6-13, p. 22). Dr. Bivona diagnosed back pain and muscle spasms. (Doc. 6-13, p. 23). Dr. Bivona discontinued Lyrica and prescribed Neurontin, Cyclobenzaprine, and Norco. (Doc. 6-13, pp. 23-24).[12]

Ms. Wade received her third epidural steroid injection on May 15, 2020. (Doc. 6-8, p. 60). Before the procedure, Ms. Wade complained of lower back pain

---

https://www.medicalnewstoday.com/articles/319404#:~:text=Everything%20you%20need%20to%20know%20about%20anterolisthesis&text=Anterolisthesis%20is%20an%20abnormal%20alignment%20of%20bones,below%2C%20leading%20to%20pain%20and%20other%20symptoms (last visited Oct. 18, 2024). The amount of slippage is graded on a scale from 1 to 4. Grade 1 is mild (20% slippage), while grade 4 is severe (100% slippage). *See* https://www.cedars-sinai.org/health-library/diseases-and-conditions/a/anterolisthesis.html (last visited Oct. 18, 2024).

Dr. Bivona ordered the CT scan because Ms. Wade complained of abdominal pain. (Doc. 6-11, p. 12). The CT scan also showed a "indeterminate hypoattenuating posterior lobe mass," which later was found to be noncancerous. (Doc. 6-11, pp. 12, 14) "Hypoattenuating is a term that a radiologist uses to describe the appearance of a finding in comparison to the density of the organ around it. It often means the radiologist has detected a benign cyst in an organ. *See* https://www.radiologyinfo.org/en/info/article-abdo-pelvic-ctreport#:~:text=Hypoattenuating%20lesion%20%E2%80%94%20this%20is%20a,benign%20cyst%20in%20an%20organ (last visited Sept. 21, 2024).

[12] "Neurontin is used in adults to treat neuropathic pain (nerve pain). *See* https://www.drugs.com/neurontin.html (last visited Oct. 18, 2024).

Cyclobenzaprine is used to treat "muscle spasms associated with acute, painful musculoskeletal conditions." *See* https://www.ncbi.nlm.nih.gov/books/NBK513362/#:~:text=Mechanism%20of%20Action-,Cyclobenzaprine%20is%20a%20centrally%20acting%20skeletal%20muscle%20relaxant%20structurally%20related,cyclobenzaprine%20reduced%20skeletal%20muscle%20hyperactivity (last visited Oct. 18, 2024).

radiating to her legs and knees that she rated at 5/10 and reported "50% improvement" for one week after the previous injection. (Doc. 6-8, pp. 60, 64). On the "Fall Risk Assessment," Ms. Wade reported that she did not need help standing or walking and did not use an assistive device to walk. (Doc. 6-8, p. 80). On May 27, 2020, Ms. Wade saw Dr. Prevost and reported that the steroid injections "gave her some improvement," but she was "still having pain." (Doc. 6-9, p. 11). Dr. Prevost discussed options with Ms. Wade, which included "learning to live with pain, conservative treatment like "chiropractic manipulation," and surgery. (Doc. 6-9, p. 11). Ms. Wade did not want surgery. (Doc. 6-9, p. 11). Dr. Prevost noted that Ms. Wade "would be able to return to work as tolerated." (Doc. 6-9, p. 11).

On June 18, 2020, Ms. Wade saw CRNP Rebekah Koza in Dr. Bivona's office and complained of severe lower back pain and fatigue. (Doc. 6-13, pp. 29-30). Ms. Wade stated that Dr. Prevost told her he "could try surgery" but that surgery was "not a definite cure." (Doc. 6-13, p. 30). Ms. Wade reported that her "[p]ain meds [were] not effective" and "want[ed] to discuss increasing [the] quantity." (Doc. 6-13, p. 30). Ms. Wade had a telemedicine visit with Dr. Bivona on June 30, 2020 and complained of severe, intermittent neck and back pain radiating into her arms. (Doc. 6-13, p. 33). Dr. Bivona increased Ms. Wade's Neurontin prescription, ordered a cervical spine MRI, and referred her to neurologist Dr. Paola Tumminello. (Doc. 6-13, p. 34).

During telemedicine visits on July 9 and August 7, 2020 with CRNP Tiffany Oliver in Dr. Bivona's office, Ms. Wade complained of severe lower back pain radiating to her neck, denied "acute symptoms," and reported "optimal pain symptom control and improved daily function" on her medications. (Doc. 6-13, pp. 37-38, 43-44). On July 9, 2020, CRNP Oliver wrote that she did "not feel as if [Ms. Wade] should have any increase in any opioid pain reliever going forward" because Ms. Wade had a "history of non-compliance dating several years back and was advised at that time that this clinic would not provide opioid pain relievers for her daily use." (Doc. 6-13, p. 38). CRNP Oliver noted that Dr. Bivona agreed to provide Ms. Wade pain medication daily and approved a Norco refill for 30 tablets at the visit. (Doc. 6-13, p. 38). At a July 20, 2020 telemedicine visit, Dr. Bivona ordered a Decadron and Toradol injection for pain and prescribed a steroid and Zanaflex. (Doc. 6-13, p. 41).[13]

On August 10, 2020, Ms. Wade saw Dr. Tumminello at BBH Walker Neurology. (Doc. 6-10, p. 12). Ms. Wade complained of paresthesia of her lower extremities, polyneuropathy, and neck and back pain. (Doc. 6-10, p. 12).[14] Ms.

---

[13] "Zanaflex is a short-acting muscle relaxer." *See* https://www.drugs.com/zanaflex.html (last visited Oct. 18, 2024).

[14] "Paresthesia is a feeling of numbness, burning, or tingling, usually in the extremities, such as the hands and feet. It may also involve a sensation of crawling or itching on the skin. It is usually temporary    but    can    be    chronic."    *See* https://www.medicalnewstoday.com/articles/318845#:~:text=What%20to%20know%20about%2

Wade stated that she had "tingling radiating to her tongue" and right side of her face when she bent down and turned her neck. (Doc. 6-10, p. 12). Ms. Wade denied problems walking because of pain and denied leg weakness. (Doc. 6-10, p. 12). Ms. Wade weighed 220 pounds and had "an above normal BMI." (Doc. 6-10, p. 13). Dr. Tumminello noted that a July 2020 cervical spine MRI showed "mild multilevel disc disease/spondylosis without significant canal stenosis/cord compression at any level." (Doc.6-10, p. 12). Dr. Tumminello found that Ms. Wade had 5/5 motor strength in her arms and legs, reduced sensation in her ankles, intact coordination, and an antalgic gait because of right hip pain. (Doc. 6-10, p. 14). Dr. Tumminello ordered a brain MRI and recommended physical therapy. (Doc. 6-10, p. 19). Ms. Wade's brain MRI was "unremarkable." (Doc. 6-11, p. 22).

On August 18, 2020, Ms. Wade saw PT Alaina Dawkins at Drayer Physical Therapy for an evaluation of cervicalgia and "abnormal posture." (Doc. 6-9, p. 66).[15] Ms. Wade complained of moderate to severe pain, difficulty with her activities of daily living, tingling in the right side of her face when she bent over, difficulty moving her neck in all directions, frequent muscle spasms, leg cramps, and weakness

---

0paresthesia&text=Paresthesia%20is%20a%20feeling%20of,temporary%20but%20can%20be%20chronic (last visited Oct. 18, 2024).

[15] Ms. Wade told PT Dawkins that she hurt her back at work lifting heavy loads in December 2019 but did not file a worker's compensation claim because she thought it was just a strained muscle. (Doc. 6-9, p. 66). Ms. Wade stated she "was terminated because she was written off from work." (Doc. 6-9, p. 66).

in her hands causing her to drop items. (Doc. 6-9, pp. 66-68, 70). Ms. Wade reported that her neck pain was 4/10 at worst, 1/10 on average, and 0/10 at best; her back pain was 8/10 at worst, 5/10 on average, and 2/10 at least. (Doc. 6-9, p. 67).[16] PT Dawkins diagnosed "cervical pain and dysfunction," muscle spasms, decreased cervical range of motion, decreased flexibility, decreased arm strength, "slight sensation changes/symptoms, and postural impairments." (Doc. 6-9, p. 70). PT Dawkins noted that Ms. Wade's limitations impacted "her ability to carry out functional tasks, such as bending down, lifting or carrying heavy loads, and turning [her] head fully" to drive and cross the street. (Doc. 6-9, p. 70). PT Dawkins wrote that Ms. Wade's "rehab potential [was] good." (Doc. 6-9, p. 70).

Ms. Wade saw PTA Courtney Smith on August 20, 2020 and complained of "increased soreness in [her] neck." (Doc. 6-9, p. 63). On August 21, 2020, Ms. Wade saw PTA Matthew Tucker and reported that she was "not that sore." (Doc. 6-9, p. 60). PTA Tucker noted mild swelling on the right side of Ms. Wade's neck and shoulder. (Doc. 6-9, p. 60). Ms. Wade tolerated her exercises well with "minimal pain" and reported that "mechanical traction helped to decrease her pain and tightness" in the right side of her neck. (Doc. 6-9, p. 60).

---

[16] PT Dawkins also wrote that Ms. Wade reported that her lumbar pain was "0 out of 10" at the visit. (Doc. 6-9, p. 67).

Ms. Wade saw Dr. Tumminello on August 26, 2020 and complained primarily of paresthesia. (Doc. 6-10, p. 24). Ms. Wade reported that Lyrica gave her a "hangover" and that she did not sleep well, was fatigued, was in constant pain, and had muscle aches and burns. (Doc. 6-10, p. 29). Dr. Tumminello noted that a July 2020 nerve conduction test showed "[m]ild [carpel tunnel syndrome] on the right" and "[m]oderate polyneuropathy" with "no evidence of a lumbar radiculopathy." (Doc. 6-10, p. 29; Doc. 6-13, pp. 122-127). Dr. Tumminello found that Ms. Wade had 5/5 motor strength in her arms and legs, reduced sensation in her ankles, intact coordination, and a normal gait. (Doc. 6-10, pp. 30-31). Dr. Tumminello's impressions included moderate polyneuropathy, paresthesia, low back pain, fibromyalgia, and chronic pain. (Doc. 6-10, p. 28). Dr. Tumminello prescribed Elavil, discussed exercise and weight loss, and recommended continued physical therapy. (Doc. 6-10, p. 28).[17]

At a visit with PTA Smith on August 26, 2020, Ms. Wade reported that she had "a lot of pain in [her] neck and stiffness in [her] back." (Doc. 6-9, p. 53). Ms. Wade tolerated exercises "well with no increased pain in her lower back or neck," and she had increased headache pain with mechanical traction but decreased pain with manual traction. (Doc. 6-9, p. 55). On August 28, 2020, Ms. Wade told PT

---

[17] Elavil "is used to treat symptoms of depression." *See* https://www.mayoclinic.org/drugs-supplements/amitriptyline-oral-route/description/drg-20072061 (last visited Oct. 18, 2024).

Dawkins that "her back always hurt[] after she [sat] too long" and that she had "knots" in her neck muscles.  (Doc. 6-9, pp. 49, 51).  Ms. Wade had "minimal complaints of cervical pain," but she complained of lower back pain.  (Doc. 6-9, p. 51).  During a visit with PTA Smith on August 31, 2020, Ms. Wade reported "a lot of pain and stiffness" in her lower back.  (Doc. 6-9, p. 45).  Ms. Wade tolerated exercises with no increased pain in her lower back, had decreased pain with stretching, and had good progress towards her goals.  (Doc. 6-9, p. 47).  PTA Smith stressed the importance of exercising "at home to maintain motion."  (Doc. 6-9, p. 47).

Ms. Wade had a telemedicine visit with Dr. Bivona on September 1, 2020 and reported severe lower back pain radiating to her neck and neuropathy.  (Doc. 6-13, p. 46).  Dr. Bivona noted that Ms. Wade's MRI on August 20, 2020 was normal. (Doc. 6-13, p. 46).[18]  Dr. Bivona prescribed Lyrica and discontinued Neurontin. (Doc. 6-13, p. 48).

At a September 2, 2020 visit with PTA Smith, Ms. Wade reported that she was "feeling a lot better in [her] back and neck" and was "not near as stiff."  (Doc. 6-9, p. 41).  Ms. Wade stated that stretches at home helped reduce stiffness and pain. (Doc. 6-9, p. 43).  PTA Smith noted that Ms. Wade had "moderate-severe weakness"

---

[18]  The Court cannot locate the August 2020 MRI results in the administrative record.  Dr. Bivona noted that he "need[ed] CD from MRI."  (Doc. 6-13, p. 48).

in her hips.  (Doc. 6-9, p. 43).  On September 3, 2020, Ms. Wade told PT Dawkins that her back hurt when she bent to pick up her granddaughter.  (Doc. 6-9, p. 37).  At the next visit, Ms. Wade noted that her pain had decreased with starting physical therapy, but she complained of stiffness in her neck and lower back.  (Doc. 6-9, p. 35).[19]  PTA Smith noted that Ms. Wade was progressing well but continued to have "poor posture with gait due to pain in [her] lower back" and increased pain standing and walking for "long periods of time."  (Doc. 6-9, p. 35).

Ms. Wade saw Dr. Tumminello on September 11, 2020 and reported that her pain was "much better," rated her pain at 2/10, indicated that she was "happy with the 2," reported that she slept well, and had no other complaints.  (Doc. 6-10, p. 43). Dr. Tumminello indicated that he reviewed a February 2020 MRI of Ms. Wade's lumbar spine that showed "[n]o clear evidence of significant stenosis" but showed "evidence of osteophytes."  (Doc. 6-10, p. 43).[20]  He also noted that Ms. Wade's July 2020 cervical spine MRI showed "[m]ild multilevel disc disease/spondylosis without significant canal stenosis/cord compression at any level."  (Doc. 6-10, p. 43).  Ms. Wade had 5/5 motor strength in all extremities, intact sensation and

---

[19] The first page of the notes for this physical therapy visit is missing, but the visit occurred between September 3 and 11, 2020.  (Doc. 6-9, p. 34).

[20] "Bone spurs are bony growths that form along bone edges. They're also called osteophytes. . . . On the small bones that form the spine, bone spurs can narrow the space that contains the spinal cord.  These bone spurs can pinch the spinal cord or its nerve roots. That can cause weakness or numbness in the arms or legs."  *See* https://www.mayoclinic.org/diseases-conditions/bone-spurs/symptoms-causes/syc-20370212#dialogId9007542 (last visited Oct. 18, 2024).

coordination, and a normal gait. (Doc. 6-10, p. 45). Dr. Tumminello noted that Ms. Wade was groggy and "off balance" on 50 mg of Lyrica. (Doc. 6-10, p. 43). Dr. Tumminello reduced Lyrica to 25 mg to treat Ms. Wade's fibromyalgia, continued Elavil, and discontinued Neurontin. (Doc. 6-10, pp. 43, 51).

At a visit with PTA Smith on September 11, 2020, Ms. Wade rated her pain at 4/10 and stated that ibuprofen helped her back pain. (Doc. 6-9, p. 31). PTA Smith wrote that Ms. Wade was "progressing well" with her functional activities and that she had increased pain with extended walking and standing. (Doc. 6-9, p. 31). On September 14, 2020, Ms. Wade reported to PTA Tucker that she was sore because she "assisted her husband" the day before "working on farm equipment" and "had to do the splits to keep from falling." (Doc. 6-9, p. 27). On September 16, 2020, Ms. Wade rated her pain at 3/10 and reported hip weakness. (Doc. 6-9, pp. 23, 25).[21] PTA Tucker noted that Ms. Wade required "an SI correction." (Doc. 6-9, p. 25).

Ms. Wade saw Dr. Bivona on September 29, 2020 and complained of severe, intermittent lower back pain radiating to her neck and mild tingling in her legs and feet at night. (Doc. 6-13, p. 50). Dr. Bivona noted that Ms. Wade did not have an ataxic gait. (Doc. 6-13, p. 52). Dr. Bivona referred Ms. Wade to neurologist Sheri

---

[21]    SI refers to the sacroiliac joint that connects the spine and pelvis. *See* https://www.ncbi.nlm.nih.gov/books/NBK557881/ (last visited Oct. 18, 2024).

Swader for a second opinion regarding Ms. Wade's complaints of "memory loss." (Doc. 6-13, pp. 52-53).

On October 7, 2020, PTA Tucker discharged Ms. Wade from physical therapy "due to noncompliance." (Doc. 6-9, pp. 20-22). PTA Tucker noted that Ms. Wade had moderate pain and difficulty in her activities of daily living and that her progress and tolerance to treatment were "fair." (Doc. 6-9, p. 21). Under "Work Status," PTA Tucker wrote "[u]nable to [w]ork." (Doc. 6-9, p. 21).

Ms. Wade saw Dr. Tumminello on October 12, 2020 and reported that she could tolerate Lyrica but was weaning off Cymbalta because her primary care physician thought it caused brain fog. (Doc. 6-10, p. 57).[22] Ms. Wade had intact concentration, 5/5 motor strength in her extremities, intact sensation and coordination, and an antalgic gait. (Doc. 6-10, pp. 58-59). Ms. Wade's medications included Elavil, Cymbalta, Norco, Robaxin, and Lyrica. (Doc. 6-10, pp. 64, 65). Dr. Tumminello's impressions included moderate polyneuropathy, low back pain, fibromyalgia, and chronic pain. (Doc. 6-10, p. 57).

Ms. Wade had a telemedicine visit with CRNP Oliver on November 9 and December 7, 2020. (Doc. 6-13, pp. 54, 55). Ms. Wade complained of severe,

---

[22] "Brain fog is a common group of symptoms that affect how you think, remember, and concentrate. It can make ordinary tasks challenging. You might lose your train of thought in the middle of a conversation. It's usually temporary, but the length of time you'll experience brain fog can vary." *See* https://my.clevelandclinic.org/health/symptoms/brain-fog (last visited Oct. 18, 2024).

intermittent lower back pain that was "better with pain meds."  (Doc. 6-13, pp. 54, 60).  Ms. Wade reported "optimal pain symptom control and improved daily function on [her] [] medications."  (Doc. 6-13, pp. 55, 61).  Ms. Wade denied "acute symptoms" and denied "changes or alterations in [her] ADLs due to pain symptoms or medication side effects."  (Doc. 6-13, pp. 55, 61).  Ms. Wade had intact insight and judgment and coherent speech during the visits.  (Doc. 6-13, pp. 55, 61).  At a November 9 visit, CRNP Oliver noted that Ms. Wade's neurologist had increased her Lyrica dosage to 50 mg.  (Doc. 6-13, p. 55).  Ms. Wade stated that she weened her Cymbalta dosage to 30mg, "did not tolerate the lower dose," and wanted to increase her Cymbalta dosage to 90 mg.  (Doc. 6-13, p. 55).  At a December 7 visit, Ms. Wade questioned whether her muscle relaxer worked and asked CRNP Oliver to double her dose of Robaxin.  (Doc. 6-13, p. 61).  CRNP Oliver did not increase the Robaxin dosage.  (Doc. 6-13, p. 61).

On January 6, 2021, Ms. Wade had a telemedicine visit with Dr. Bivona and complained of severe, intermittent lower back pain radiating into her neck.  (Doc. 6-13, pp. 63, 65).  Ms. Wade had intact judgment and insight, coherent speech, and appropriate mood and affect.  (Doc. 6-13, p. 64).  Dr. Bivona diagnosed myalgia, malaise, and muscle spasms.  (Doc. 6-13, p. 64).  Ms. Wade's medications included Lyrica 50 mg, Norco, and Robaxin.  (Doc. 6-13, p. 65).

Ms. Wade saw Dr. Bivona and CRNP Jane Eggenberger on April 6, 2021 and complained of severe, intermittent back, joint, and neck pain. (Doc. 6-14, pp. 33-35). Ms. Wade also reported "brain fog." (Doc. 6-14, p. 35). Ms. Wade wanted to discuss changing her medications because of side effects. (Doc. 6-14, p. 33). CRNP Eggenberger noted that Topamax might be causing Ms. Wade's brain fog, but Ms. Wade did not want to discontinue Topamax. (Doc. 6-14, p. 35).[23] CRNP Eggenberger wrote that Ms. Wade had been referred to neurology, but Ms. Wade reported "there was a conflict while applying for disability." (Doc. 6-14, p. 35). CRNP Eggenberger increased Ms. Wade's Norco dose to 10 mg and decreased the Lyrica dose to 25 mg with plans to wean Ms. Wade from Lyrica because of weight gain. (Doc. 6-14, p. 35).

On May 5, 2021, Ms. Wade saw Dr. Bivona and complained of severe, intermittent back, joint, and neck pain. (Doc. 6-14, pp. 36, 39). Ms. Wade reported improved cognition with weening from Lyrica. (Doc. 6-14, p. 38). Dr. Bivona noted that Ms. Wade "still need[ed] to see neurology," that Ms. Wade was "applying for disability, and that his "work up [was] limited as [Ms. Wade] decline[d] further testing due to finances with lack of insurance." (Doc. 6-14, p. 38). Dr. Bivona

---

[23] Topamax is the brand name for topiramate and is used to prevent migraine headaches. *See* https://www.drugs.com/topamax.html (last visited Oct. 18, 2014). Topiramate is also used "in the short-term treatment of binge eating disorder associated with obesity." *See* https://pubmed.ncbi.nlm.nih.gov/12562571/ (last visited Oct. 18, 2024).

prescribed Cymbalta 20 mg for depression and anxiety, increased Norco to two times a day, prescribed Topamax for "binge eating," and continued Robaxin. (Doc. 6-14, p. 38).

On June 3, 2021, Ms. Wade saw CRNP Oliver and rated her back pain at 2/10. (Doc. 6-14, p. 40). Ms. Wade reported "optimal pain symptom control and improved daily function on [her] [] medications." (Doc. 6-14, p. 41). Ms. Wade moved "all extremities well" and had no swelling. (Doc. 6-14, p. 41). CRNP Oliver increased Cymbalta to 60 mg. (Doc. 6-14, p. 42). At a July 1, 2021 visit, Ms. Wade rated her back pain as severe at 7/10. (Doc. 6-14, p. 43). CRNP Oliver noted that Ms. Wade reported "optimal pain symptom control," improved daily function on her medications, and no acute symptoms. (Doc. 6-14, p. 44). CRNP Oliver diagnosed chronic pain syndrome, back and neck pain, malaise, and muscle spasms. (Doc. 6-14, p. 44). Ms. Wade signed a "pain agreement" that included periodic, random drug testing. (Doc. 6-14, p. 45). Ms. Wade was "compliant with the medical regimen," "exhibit[ed] no aberrant behavior or drug seeking tendencies," and had "increase[d] function with the medications." (Doc. 6-14, p. 45).

At an August 6, 2021 visit with Dr. Bivona and CRNP Eggenberger, Ms. Wade complained of moderate to severe, intermittent back, joint, and neck pain. (Doc. 6-15, pp. 5, 6, 8). Ms. Wade reported that her myalgia and chronic pain were "better with [C]ymbalta." (Doc. 6-15, p. 7). On physical examination, Ms. Wade

had "decreased [range of motion] of spinal processes secondary to pain" and a normal gait. (Doc. 6-15, p. 6). Ms. Wade's medications included Cymbalta, Robaxin, Zanaflex, and Ropinirole. (Doc. 6-15, p. 7). At telemedicine visits with CRNP Oliver on August 24 and September 21, 2021, Ms. Wade rated her back and neck pain at 7/10. (Doc. 6-15, pp. 9-11, 12-14). On October 28, 2021, Ms. Wade saw Dr. Bivona and CRNP Jane Herald and reported moderate to severe, intermittent back, joint, and neck pain. (Doc. 6-15, pp. 15-16, 18). There was decreased range of motion in Ms. Wade's "spinal processes secondary to pain." (Doc. 6-15, p. 16). Ms. Wade had a normal gait. (Doc. 6-15, p. 16). CRNP Herald administered an injection for pain and wrote that Ms. Wade "declined health[care] main[ly] due to no insurance." (Doc. 6-15, p. 18).

At a November 23, 2021 telemedicine visit with CRNP Oliver, Ms. Wade rated her back pain at 7/10. (Doc. 6-15, pp. 19, 21). CRNP Oliver added a prescription for ibuprofen for arthritis pain. (Doc. 6-15, p. 21). Ms. Wade saw CRNP Oliver on December 14, 2021 and rated her back pain at 7/10. (Doc. 6-15, pp. 22, 25). CRNP Oliver's physical examination was positive for back and neck pain; Ms. Wade moved all extremities well and had no swelling. (Doc. 6-15, p. 24). CRNP Oliver's assessment included chronic pain syndrome, muscle spasms, and malaise. (Doc. 6-15, p. 24). CRNP Oliver refilled Ms. Wade's Norco prescription. (Doc. 6-15, pp. 24-25).

Ms. Wade saw CRNP Oliver on February 8, 2022 and rated her back pain at 4/10. (Doc. 6-15, pp. 26, 29). A thoracic spine x-ray showed "mid to lower thoracic kyphosis," "moderate to severe generalized interspace narrowing," and no fracture. (Doc. 6-15, p. 38).[24] A cervical spine x-ray revealed "mild generalized interspace narrowing," no fracture, and degenerative change. (Doc. 6-15, p. 39). A lumbosacral spine x-ray showed "[mild] scoliosis and degenerative change," prominent grade 1 "spondylolisthesis of L3 and L4", and "possible L3 pars defects." (Doc. 6-15, p. 40).[25] At a March 9, 2022 telemedicine visit, CRNP Herald noted that Ms. Wade's "chronic illnesses [were] stable." (Doc. 6-15, pp. 43, 45). Ms. Wade reported neck pain, back pain, and depression. (Doc. 6-15, p. 44). CRNP Herald increased Ms. Wade's Cymbalta dosage to 120 mg. (Doc. 6-15, p. 44).

On April 7, 2022, Ms. Wade saw CRNP Rebekah Koza in Dr. Bivona's office and rated her back pain at 4/10. (Doc. 6-15, pp. 46, 49). Ms. Wade reported that medication and heat made her pain better and that fatigue, cold weather, and walking made her pain worse. (Doc. 6-15, pp. 47, 48). Ms. Wade had back and neck pain,

---

[24] "Kyphosis is defined as a curvature of the spine measuring 50 degrees or greater on an [x]-ray. . . . The normal spine can bend from 20 to 45 degrees of curvature in the upper back area. Kyphosis is a type of spinal deformity." *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/kyphosis#:~:text=What%20is%20kyphosis?,Menu (last visited Oct. 18, 2024).

[25] "Grade I spondylolisthesis is 1 to 25% slippage" [lowest level]. *See* https://www.ncbi.nlm.nih.gov/books/NBK430767/#:~:text=Grade%20I%20spondylolisthesis%20is%201,spondyloptosis%20or%20grade%20V%20spondylolisthesis (last visited Oct. 18, 2024).

no muscle weakness, good movement of extremities, no swelling, intact cranial nerves, and no focal deficits. (Doc. 6-15, pp. 47-48). At a May 5, 2022 visit with CRNP Felicia Seals, Ms. Wade rated her lower back pain at 7/10. (Doc. 6-15, pp. 50, 53). Ms. Wade reported that in the preceding month, her pain level was 9/10 to 10/10 at worse, 4/10 at least, and 7/10 on average. (Doc. 6-15, p. 51). Ms. Wade had no muscle weakness, no loss of movement, and no swelling. (Doc. 6-15, pp. 51-52). CRNP Seals noted that Ms. Wade was "maxed out on Cymbalta," that Ms. Wade's "pain [was] still not well[-]controlled," and that Ms. Wade was "waiting for insurance to [follow up] with Rheumatology, Neurology, and Ortho." (Doc. 6-15, p. 52). CRNP Seals assessed chronic pain syndrome and continued Ms. Wade's medications. (Doc. 6-15, pp. 50, 52).

### *Dr. Ramesh Reddy's Consultative Physical Examination*

On April 20, 2021, at the request of the Social Security Administration, Dr. Reddy reviewed Ms. Wade's medical records and examined her. (Doc. 6-13, pp. 129-33). Ms. Wade reported that she had not worked since December 2019 after she was "hurt at work." (Doc. 6-13, p. 129). She stated that she was fired from Clayton Homes because the pain in her neck and back prevented her from performing the duties of her job. (Doc. 6-13, p. 129). Ms. Wade indicated that she could not perform a job that was less demanding physically because back pain and

neuropathy in her legs made it difficult to stand or sit for extended periods of time. (Doc. 6-13, p. 129).

Ms. Wade reported that she could perform all activities of daily living independently.  (Doc. 6-13, p. 129).  Dr. Reddy noted that Ms. Wade scored six on the "Katz Index of Independence in Activities of Daily Living," which reflected full independence.  (Doc. 6-13, p. 129, 136).[26]  Ms. Wade stated that she could button buttons, open doorknobs, tie shoelaces, pick up small objects, and hold glasses without difficulty.  (Doc. 6-13, p. 129).  Dr. Reddy noted that Ms. Wade could stoop and recover unassisted, stand from a seated position without difficulty, and position herself on the exam table without difficulty.  (Doc. 6-13, pp. 129, 131).

Dr. Reddy's physical examination showed that Ms. Wade had tenderness on palpation in her cervical, thoracic, and lumbar spine; "slight decrease" in her range of motion in her cervical and dorsolumbar spine and hips; decreased sensation in her legs, "no trigger point pain" in her sacroiliac joints or cervical region; no joint swelling; "some pain" in her hips with range of motion exercises; normal reflexes; and 5/5 grip strength in her right hand and 4/5 in her left hand.  (Doc. 6-13, pp. 131-32).  Ms. Wade had a steady gait, could "heel toe walk" without assistance, and did

---

[26] "The Katz Index of Independence in Activities of Daily Living, commonly referred to as the Katz ADL, is the most appropriate instrument to assess functional status as a measurement of a person's ability to perform activities of daily living independently." Here, Ms. Wade is deemed to be independent at a score of 6. *See* https://www.alz.org/careplanning/downloads/katz-adl.pdf (last visited Oct. 10, 2024).

not use an assistive device to walk. (Doc. 6-13, p. 132). Dr. Reddy noted that Ms. Wade's "strength [was] decreased after repetitive motions." (Doc. 6-13, p. 132). Ms. Wade showed "no signs of emotional turmoil." (Doc. 6-13, p. 132).

Ms. Wade's medications included Cymbalta, Robaxin, Norco, and Lyrica. (Doc. 6-13, p. 130). Dr. Reddy diagnosed fibromyalgia, spinal spondylolisthesis, spinal stenosis, neuropathy and paresthesia in Ms. Wade's legs, degenerative disc disease of the cervical and lumbar spine, and chronic fatigue. (Doc. 6-13, p. 133). Dr. Reddy concluded that Ms. Wade's "physical limitations would [not] preclude her from working in a sedentary job environment." (Doc. 6-13, p. 133).[27]

### Dr. Howard Rodgers's Consultative Mental Examination

On May 3, 2021, at the request of the Social Security Administration, licensed professional counselor Dr. Rodgers reviewed Ms. Wade's medical records and evaluated her. (Doc. 6-14, p. 3). Ms. Wade reported that she left her job at Clayton Homes in December 2019 because of her pain level. (Doc. 6-14, p. 4). She indicated

---

[27] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). "If someone can do light work . . . she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

31

that she lived with her husband and could perform her activities of daily living independently.  (Doc. 6-14, p. 5).

Ms. Wade reported depression "because of her pain levels."  (Doc. 6-14, p. 3).  Ms. Wade reported that she took Cymbalta for pain, not depression.  (Doc. 6-14, p. 3).  Dr. Rodgers noted that Ms. Wade was appropriately dressed and had good hygiene.  (Doc. 6-14, p. 4).  Ms. Wade had normal speech, an "OK" mood and affect, normal attention and concentration, intact thought processes and content, normal insight and judgment, and no psychosis.  (Doc. 6-14, pp. 4-5).  She could complete a three-stage command; could recall four items immediately and after seven minutes could remember one of the four items; could remember events from her childhood and was a "reliable historian;" and had average intellectual functioning.  (Doc. 6-14, p. 4).

Dr. Rodgers diagnosed Ms. Wade with "Major Depressive Disorder, Recurrent, Mild and Memory Loss" and stated that her chronic pain was a significant contributing factor.  (Doc. 6-14, p. 5).  Dr. Rodgers opined that Ms. Wade could comprehend simple and complex instructions but had impairments carrying out instructions "due to her multiplicity of issues;" could "recall simple or complex instructions after 15 to 30 minutes;" would have moderate difficulty "relating with co-workers or supervisors/supervision;" would have "significant troubles with managing work related pressures;" and had "mildly restricted interests."  (Doc. 6-

14, p. 5). Dr. Rodgers noted that Ms. Wade's prognosis was "poor to guarded for much improvement" even with treatment and that her "diagnoses seem[ed] pronounced, even though they [were] not severe." (Doc. 6-14, p. 5).

### *Ms. Wade's Function Report*

On March 2, 2021, at the request of the Social Security Administration, Ms. Wade completed an adult function report. (Doc. 6-7, pp. 43-50). Ms. Wade stated that she lived in a house with her disabled husband. (Doc. 6-7, pp. 43-44). She indicated that she fed her pets but needed help grooming them. (Doc. 6-7, p. 44). Ms. Wade reported that she could dress herself but was unbalanced when she put on her pants; could bathe and feed herself without difficulty; took longer to care for her hair because of weak shoulders and arms; and had difficulty shaving. (Doc. 6-7, p. 44). She needed reminders to take her medication; prepared simple meals with her husband; could sweep and mop but doing so caused pain; and could dust, fold clothes, vacuum, wash dishes, and clean the bathroom with her husband's help, but it took them several days with breaks. (Doc. 6-7, p. 45).

Ms. Wade indicated that she went outside on nice days, but cold weather "hurt" her; she could drive short distances; and she shopped for groceries and clothes in stores and by phone for "20-30 minutes." (Doc. 6-7, p. 46). She could pay bills, count change, handle a savings account, and use a checkbook. (Doc. 6-7, p. 46).

Ms. Wade stated that she enjoyed reading, socialized with her children and parents every other day, and stayed close to home because of COVID. (Doc. 6-7, p. 47).

Ms. Wade reported that her medical conditions affected her ability to lift, squat, bend, stand, walk, sit, climb stairs, remember, complete tasks, and concentrate. (Doc. 6-7, p. 48). She could not walk far before needing to rest for a minute. (Doc. 6-7, p. 48). Ms. Wade reported that she felt like she had attention deficit disorder, could follow written and verbal instructions "ok," and got along with authority figures "ok." (Doc. 6-7, p. 48). Ms. Wade stated that she did not handle stress well, could handle changes in routine "ok after a day or two," and got upset when she ran out of medication. (Doc. 6-7, p. 49).

### *Ms. Wade's Husband's Third-Party Function Report*

On March 1, 2021, Todd Wade, Ms. Wade's husband, completed an adult third-party function report. (Doc. 6-7, pp. 19-26). Mr. Wade reported that Ms. Wade had the limitations included in Ms. Wade's function report. (Doc. 6-7, p. 34). Mr. Wade indicated that Ms. Wade helped him with his "socks and shoes" because of his disability. (Doc. 6-7, p. 20). He stated that Ms. Wade could not stand longer than 20 minutes, and she could walk about 200 feet before she needed to rest "a minute or 2." (Doc. 6-7, pp. 19, 24). Mr. Wade reported that Ms. Wade could not hold her 30-pound grandchild long while "standing" and could bend but had difficulty "standing back up straight." (Doc. 6-7, p. 24). Mr. Wade stated that Ms.

Wade took medications to help her sleep because of leg cramps and "severe muscle spasms" that sometimes woke her. (Doc. 6-7, p. 20).

Mr. Wade indicated that Ms. Wade needed reminders to take medications; could prepare meals "about an hour" but had to sit and stand while doing so; could sweep, wash dishes, fold clothes, and clean the bathroom over a long period of time; had pain doing yard work; and was "down for 2 days" when she drove 45 minutes to her mom's house and back. (Doc. 6-7, pp. 20-21). Mr. Wade reported that Ms. Wade did not handle stress well and that her neurologist advised her "to be stress free" and told her she "would be paralyzed" if she did not make "lifestyle changes." (Doc. 6-7, p. 25). Mr. Wade indicated that Ms. Wade did not have side effects from her medications. (Doc. 6-7, p. 26).

### Administrative Hearing

Ms. Wade attended a telephone administrative hearing with an ALJ on June 21, 2022. (Doc. 6-3, p. 48). Ms. Wade reported that she was 48 years old and lived with her disabled husband. (Doc. 6-3, pp. 55-56). Ms. Wade testified that her back pain started in December 2019 when she lifted too much weight at work. (Doc. 6-3, pp. 64, 74-75). Because of her back pain, she stated she could no longer work and was fired from her job. (Doc. 6-3, pp. 64, 74-75). Ms. Wade testified that her COBRA medical insurance expired about a year before the hearing. (Doc. 6-3, pp. 72-73). Ms. Wade stated that she looked for but could not find affordable insurance

coverage and that she had depleted her savings. (Doc. 6-3, pp. 79-80). Mr. Wade paid for her doctor visits for pain management. (Doc. 6-3, p. 81).

Ms. Wade testified that she received epidural injections for pain, but the injections did not help. (Doc. 6-3, p. 64). Ms. Wade rated her back pain at 7/10 on average and 9/10 at worse. (Doc. 6-3, pp. 64-65). Ms. Wade testified that she had neck pain that she rated at 5/10 or 6/10 on average. (Doc. 6-3, p. 65). She stated that her neck pain caused daily headaches that eased with rest, relaxation, and Norco. (Doc. 6-3, p. 66). Ms. Wade testified that she had neuropathy in both legs, that her legs tingled and went numb, that she did not have much feeling in her feet and shins, and that the neuropathy was worse when she stood too long. (Doc. 6-3, pp. 66-67). Ms. Wade indicated that Dr. Tumminello diagnosed her with fibromyalgia at the final visit "before [Ms. Wade's] insurance ran out." (Doc. 6-3, p. 67). She stated that her depression was related to her inability to work. (Doc. 6-3, p. 71). Ms. Wade stated that she had fibromyalgia pain in her temples, neck, and knees. (Doc. 6-3, p. 67). Ms. Wade took Norco for pain; Cymbalta for depression, back pain, and nerve pain; Robaxin for muscle spasms; and amitriptyline for nerve pain. (Doc. 6-3, p. 65). Ms. Wade testified that she had gained nearly 100 pounds since December 2019. (Doc. 6-3, pp. 67-68).

Ms. Wade testified that washing dishes and doing laundry took longer because she had to take breaks because of her pain. (Doc. 6-3, pp. 68-69). She stated that

she could sit 15 or 20 minutes before she had to get up and move, could stand 5 minutes before she had to prop up "over the counter," could walk "[a]bout 100 yards" before she needed to stop and rest, and would lie down about seven or eight hours during a workday because of her pain. (Doc. 6-3, pp. 69-71). Ms. Wade stated that she and her husband babysat her two-year-old grandson every other day for most of the day. (Doc. 6-3, p. 78). She indicated that she could not pick up her grandson who weighed about 30 pounds. (Doc. 6-3, pp. 78-79).

Ms. Wade reported that she had brain fog and would "go[] to a room and be[] lost." (Doc. 6-3, p. 72). She stated she had not driven in a year because her husband was afraid she would not know where to go and because the constant pressure on her foot caused pain; she could drive short distances if necessary. (Doc. 6-3, pp. 72, 76). Ms. Wade testified that her husband drove her to North Carolina for her son's graduation from Marine boot camp; the trip took 12 to 14 hours with stops. (Doc. 6-3, p. 77).

Bradley Brown testified as a vocational expert at Ms. Wade's administrative hearing. (Doc. 6-3, p. 82). Mr. Brown classified Ms. Wade's past work as a furniture sander as semiskilled, light work but performed at the heavy exertional level; an assembler as semi-skilled, medium work; a spray painter as unskilled, medium work; a farmhand as skilled, heavy work; and a nurse assistant as semi-skilled, medium work but performed at the heavy exertional level. (Doc. 6-3, p. 84). The ALJ asked

Mr. Brown to assume a hypothetical individual with the same age, education, and

work experience as Ms. Wade with the following limitations:

> [The individual] could occasionally lift and/or carry up to twenty
> pounds and frequently lift and/or carry up to ten pounds. She could
> stand and/or walk in combination with normal breaks for a total of two
> hours during a[n] eight-hour workday, and she [could] sit with normal
> breaks for six to eight hours during an eight-hour workday. She could
> occasionally climb ramps and stairs[] and should never climb ladders,
> ropes, or scaffolds.  She could occasionally balance, stoop, kneel,
> crouch, and crawl.  She could tolerate occasional . . . exposure to
> extreme heat, extreme cold, wetness, and humidity.  She should not be
> required to work in areas of vibration. She should avoid exposure to
> industrial hazards, including working at unprotected heights, working
> in close proximity to moving, dangerous machinery, and the operation
> of motorized vehicles and equipment.
>
> She could perform simple, routine tasks requiring no more than simple
> work-related decision making. She could have frequent interactions
> with coworkers and supervisors[] and occasional interactions with
> members of the general public.  She could adapt and respond
> appropriately to occasional, well[-]explained changes in the workplace.

(Doc. 6-3, pp. 85-86).  Mr. Brown testified that the individual could not perform Ms.

Wade's past work but could perform sedentary, unskilled work as a document

preparer with 16,800 available jobs nationally and as an election clerk with 6,000

available jobs nationally.  (Doc. 6-3, pp. 86-87).

In the ALJ's second hypothetical, she asked Mr. Brown to assume the same

limitations as the first hypothetical except the individual could occasionally lift

and/or carry ten pounds and frequently lift and/or carry less than ten pounds; could

never kneel, crouch, or crawl; and could not perform push/pull movements or

operate foot controls with her lower extremities.  (Doc. 6-3, pp. 87-88).  Mr. Brown testified that the individual could not perform Ms. Wade's past work but could work as a document preparer and election clerk.  (Doc. 6-3, p. 88).

In the third hypothetical, the ALJ posed the same limitations as the first and second hypotheticals but added that the individual could not maintain concentration, persistence, or pace sufficiently to complete an eight-hour workday and would be absent from work an average of two or more days per month on a regular and continuing basis.  (Doc. 6-3, p. 89).  Mr. Brown stated those limitations would preclude all work.  (Doc. 6-3, p. 89).  Mr. Brown clarified that the "general rule for absenteeism is no more than one day per month on a consecutive basis."  (Doc. 6-3, pp. 89-90).

## THE ALJ'S DECISION

On August 3, 2022, the ALJ issued an unfavorable decision.  (Doc. 6-3, pp. 16-31).  The ALJ found that Ms. Wade had not engaged in substantial gainful activity from her alleged onset date of December 16, 2019 through her date last insured of December 31, 2021.  (Doc. 6-3, p. 18).[28]  The ALJ determined that Ms.

---

[28]  A claimant is eligible for disability insurance benefits if she had a disability on or before the date last insured.  *See* 42 U.S.C. §§ 416(i)(3), 423(a)(1)(A).  If a claimant becomes disabled after her insured status expires, the ALJ must deny the disability insurance benefits claim.

The ALJ noted that Ms. Wade worked after the alleged onset date, but her earnings did not rise to the level of substantial gainful activity.  (Doc. 6-3, p. 18).

Wade suffered from the severe impairments of degenerative disc disease of the cervical, thoracic, and lumbar spine with lumbar spondylolisthesis/instability at L3-4 and L4-5; polyneuropathy of the lower extremities; fibromyalgia; hypertension; obesity; depressive disorder; and a neurocognitive disorder. (Doc. 6-3, p. 18). Based on a review of the medical evidence, the ALJ concluded that Ms. Wade did not have an impairment or a combination of impairments that met or medially equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 19).

Considering Ms. Wade's impairments, the ALJ evaluated Ms. Wade's residual functional capacity. (Doc. 6-3, pp. 21-22). The ALJ determined that Ms. Wade had the RFC to perform:

> a range of light to sedentary work . . . except she [could] occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds[;] . . . [could] stand and/or walk in combination, with normal breaks, for a total of two hours during an eight-hour workday[;] . . . [could] sit, with normal breaks, for six to eight hours during an eight-hour workday[;] . . . [could] occasionally climb ramps and stairs and should never climb ladders, ropes or scaffolds[;] . . . [could] occasionally balance, stoop, kneel, crouch, and crawl[;] . . . [could] tolerate occasional . . . exposure to extreme heat [and] cold, wetness, and humidity[;] . . . should [not] be required to work in areas of vibration[;] . . . should avoid exposure to industrial hazards, including working at unprotected heights, working in close proximity to moving[,] dangerous machinery and the operation of motorized vehicles and equipment[;] . . . [could] perform simple[,] routine tasks requiring no more than simple work-related decision making[;] . . . [could] have frequent interactions with co-workers and supervisors and occasional interactions with members of the general public[;] . . . [and

could] adapt and respond appropriately to occasional, well-explained changes in the workplace.

(Doc. 6-3, pp. 21-22).

Based on this RFC and relying on testimony from Mr. Brown, the ALJ concluded that Ms. Wade could not perform her past relevant work. (Doc. 6-3, p. 30). Relying on testimony from Mr. Brown, the ALJ found that other jobs existed in significant numbers in the national economy that Ms. Wade could perform, including document preparer and election clerk. (Doc. 6-3, pp. 30-31). Accordingly, the ALJ determined that Ms. Wade was not disabled as defined by the Social Security Act. (Doc. 6-3, p. 31).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g). "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks

whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (quoting *T-Mobile South*, *LLC* v. *Roswell*, 574 U.S. 293, 301 (2015), and *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (emphasis omitted).  Substantial evidence means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 587 U.S. at 103 (quoting *Consolidated Edison Co.*, 305 U.S. at 229); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (same).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citations omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158-59); *see also Mitchell v. Comm'r, Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2015) (same).

With respect to an ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards.  That review is *de novo*.  *Lewis v. Barnhart*, 285 F.3d 1329, 1330 (11th Cir. 2002).  If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis,

then the court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

# DISCUSSION

## *Application of the Eleventh Circuit Pain Standard*

Ms. Wade argues that the ALJ improperly applied the Eleventh Circuit's pain standard and that substantial evidence does not support the ALJ's reasons for discrediting Ms. Wade's subjective statements regarding the limiting effects of her impairments.  (Doc. 12, p. 15).  The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through h[er] own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r of Soc. Sec.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019). When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]."  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r of Soc. Sec.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*).  If the ALJ does not properly apply the three-part standard, reversal is appropriate.

*McLain v. Comm'r of Soc. Sec.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r of Soc. Sec.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225. The Commissioner must accept the claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When a claimant relies on her testimony to establish a disabling impairment, an ALJ must follow Social Security Regulation 16-3p. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

44

SSR 16-3p, 2017 WL 5180304, at *4.  Concerning the ALJ's burden to explain the

reasons for discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough . . .  simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2017 WL 5180304, at *10.

> In evaluating a claimant's reported symptoms, an ALJ must consider:

> (i)   [the claimant's] daily activities;

> (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

> (iii) [p]recipitating and aggravating factors;

> (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

> (v)  [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

> (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

> (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ found that Ms. Wade's severe impairments of degenerative disc disease with lumbar spondylolisthesis at L3-4 and L4-5, neuropathy, fibromyalgia, depression, obesity, and neurocognitive disorder "could reasonably be expected to cause [Ms. Wade's] alleged symptoms" but concluded that the "intensity, persistence, and limiting effects of [Ms. Wade's] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (Doc. 6-3, p. 22). The ALJ found that the medical evidence did "not support [Ms. Wade's] allegations of severe and chronic limitation of function to the degree it would preclude the performance of all substantial gainful activity." (Doc. 6-3, p. 22).

To support her pain standard findings, the ALJ found that the "medical evidence as a whole show[ed] [Ms. Wade's] most recent pain level as a 2/10." (Doc. 6-3, p. 28). Without a citation to Ms. Wade's medical records, the ALJ stated that Ms. Wade "consistently note[d] improvement in pain control with no greater than a 3/10 pain rating that does not affect her ability to perform her activities of daily living." (Doc. 6-3, p. 27). Ms. Wade's medical record does not support the ALJ's findings regarding Ms. Wade's reported pain levels. At medical visits in August, September, November, and December 2021, before her date last insured on December 31, 2021, Ms. Wade consistently reported her pain level at 7/10 despite

pain medication compliance. (Doc. 6-15, pp. 9, 12, 19, 22). Though Ms. Wade reported her pain level at 4/10 at February and April 2022 visits, by a May 2022 visit, Ms. Wade reported that her pain with pain medication compliance was 7/10 at the visit and was 7/10 on average, 4/10 at least, and 9/10 to 10/10 at worse. (Doc. 6-15, pp. 26, 46, 50-51). Ms. Wade reported that a pain level of 2/10 was tolerable. (Doc. 6-10, p. 43).

The ALJ stated that Ms. Wade reported a pain level between 0/10 and 4/10 during physical therapy sessions between February and April 2020. (Doc. 6-3, p. 23; *see* Doc. 6-9, pp. 80, 84, 88, 92, 98, 107, 110, 114, 121, 125-26, 137). That is true, (Doc. 6-9, pp. 110-111, 135). Citing to an October 2020 physical therapy "End of Care" note in "Exhibit 3F/2," the ALJ stated that Ms. Wade's pain improved during physical therapy "as she rated her pain as 1/10 and worst pain as 4/10." (Doc. 6-3, p. 23). Between August and October 2020, Ms. Wade's physical therapy focused on her neck pain, and those pain level ratings appear to regard her neck pain. (Doc. 6-9, p. 20). The ALJ omitted from her discussion of Exhibit 3F/2 records in which Ms. Wade rated her lumbar pain at 8/10 at worse, 5/10 on average, and 2/10 at least, and the ALJ did not mention that Ms. Wade reported moderate decreased functional status, moderate to severe difficulty sleeping, moderate stiffness, and moderate weakness because of her pain. (Doc. 6-9, p. 20).

The ALJ stated that Ms. Wade reported her pain levels between 2/10 and 6/10 during a January 2020 visit with Dr. Prevost. (Doc. 6-3, p. 23). Ms. Wade reported to Dr. Prevost that her pain fluctuated between 2/10 and 8/10, not 6/10. (Doc. 6-8, p. 29). At visits with Dr. Bivona and his CRNPs in February, May, June, September, November, and December 2020 and in January, April, May, and August 2021, Ms. Wade reported moderate to severe back pain that radiated to her neck and legs and neuropathy. (Doc. 6-13, pp. 8, 22, 29, 46, 50, 54, 60; Doc. 6-14, pp. 33; Doc. 6-15, p. 5). Ms. Wade reported in June 2020 that her pain medications were not effective; Dr. Bivona ordered a Decadron and Toradol injection for pain in July 2020; CRNP Eggenberger increased Ms. Wade's Norco prescription in April 2021; and Dr. Bivona increased Norco to two times a day in May 2021. (Doc. 6-13, pp. 30, 41; Doc. 6-14, pp. 35, 38). In May 2022, CRNP Seals noted that Ms. Wade's pain was not well-controlled and that her prescription for Cymbalta was "maxed out." (Doc. 6-15, p. 52). The ALJ credited Ms. Wade's testimony that Cymbalta was prescribed for pain. (Doc. 6-3, p. 21). Based on the inconsistencies between the ALJ's findings and the medical record regarding Ms. Wade's reported pain levels, substantial evidence does not support the ALJ's conclusion that Ms. Wade's "most recent" pain level was 2/10 to 3/10.

In evaluating Ms. Wade's reported symptoms, the ALJ had to consider Ms. Wade's daily activities. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ

found that Ms. Wade had "daily activities which [were] not limited to the extent one would expect given [her] complaints of disabling symptoms and limitations." (Doc. 6-3, p. 28). The ALJ concluded that Ms. Wade was not disabled because Ms. Wade could work in her flower beds, could lift her 25-pound grandchild who she babysat, was independent in her "personal care needs," washed dishes, did laundry, swept, mopped, vacuumed, cleaned the bathroom, dusted, and went grocery shopping. (Doc. 6-3, pp. 21, 28). The ALJ found that these activities were "directly contradictory to [Ms. Wade's] allegations that she [was] unable to work in any capacity." (Doc. 6-3, p. 28). The ALJ did not mention the evidence concerning the pain Ms. Wade experienced when she performed these activities.

In her March 2021 "Function Report-Adult," Ms. Wade indicated that, because of her physical impairments and pain, she was unbalanced when she put on her pants, took longer to care for her hair, had difficulty shaving, had difficulty sweeping and mopping, had to take breaks doing simple household chores with her husband's help, and could not walk far before needing to rest. (Doc. 6-7, pp. 44-45). Ms. Wade testified at the hearing that washing dishes and doing laundry took longer because she had to take breaks because of her pain. (Doc. 6-3, pp. 68-69). Ms. Wade reported to Dr. Prevost in January 2020 and PTA Crowe in February 2020 that she (Ms. Wade) had increased pain standing, cleaning the kitchen, washing dishes, and lifting. (Doc. 6-8, p. 29; Doc. 6-9, p. 110). Ms. Wade told Dr. Bivona

in March 2020 that her back pain was worse with activity, reported to PTA Crowe in April 2020 that she (Ms. Wade) could perform activities of daily living with "modified changes due to pain," and reported to PTA Smith in September 2020 increased pain with extended walking and standing. (Doc. 6-9, pp. 33, 77; Doc. 6-13, p. 14). The ALJ did mention Ms. Wade's need to rest when doing simple chores because of pain. (Doc. 6-3, p. 23) ("She did report being able to do stuff at home but ha[d] to rest.").

The ALJ cited Ms. Wade's ability to lift her 25-pound grandchild and included in Ms. Wade's RFC a statement that she occasionally could lift 20 pounds. (Doc. 6-3, pp. 21, 28). The ALJ mentioned that Ms. Wade reported a "cold, wet feeling in her left hip" when she picked up her 25-pound grandchild. (Doc. 6-3, p. 23; *see* Doc. 6-9, pp. 95, 102). The ALJ did not mention Ms. Wade's testimony at the hearing that she no longer could pick up her grandchild because doing so caused pain. (Doc. 6-3, pp. 78-79). The ALJ's finding regarding Ms. Wade's ability to lift seemed to ignore that lifting her grandchild increased her pain and is contrary to Dr. Prevost's recommendation that Ms. Wade lift no more than 15 pounds, (Doc. 6-8, p. 32), and Dr. Reddy's opinion that Ms. Wade could work at the sedentary level and lift no more than 10 pounds, (Doc. 6-13, p. 133). Substantial evidence does not support the ALJ's finding that Mr. Wade could lift and carry 20 pounds occasionally.

An ALJ may not cherry-pick the parts of a claimant's daily activities that support her conclusion and disregard testimony regarding limitations in performing those daily activities. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was reached "by focusing upon one aspect of the evidence and ignoring other parts of the record"); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). Additionally, "participation in everyday activities of short duration . . . does not disqualify a claimant from disability." *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997); *see also Haugen v. Astrue*, 497 F. Supp. 2d 1315, 1327 (N.D. Ala. 2007) ("The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled.").

The ALJ also had to consider measures that Ms. Wade used to try to reduce her pain. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ did not mention Ms. Wade's testimony regarding her need to lay down many hours each day to help alleviate her pain. (*See* Doc. 6-3, pp. 70-71).

The ALJ found that the record contained no "objective evidence to support the severity of [Ms. Wade's] back impairment, including sensory loss, with proper

radicular distribution; muscle spasms, causing straightening, curve, motor loss; and atrophy." (Doc. 6-3, p. 26). The ALJ pointed to records that showed Ms. Wade had a normal gait and did not use an ambulatory device. (Doc. 6-3, p. 28). Though Ms. Wade did not use an ambulatory device, Ms. Wade had an irregular and antalgic gait at many visits. (Doc. 6-9, p. 35; Doc. 6-10, pp. 14, 59; Doc. 6-13, p. 10). Dr. James noted that Ms. Wade had lumbar spasms in January 2020; Dr. Bivona diagnosed muscle spasms in May 2020; PT Dawkins assessed muscle spasms on physical examination in August 2020, and CRNP Oliver assessed muscle spasms in July and December 2021. (Doc. 6-9, p. 70; Doc. 6-13, p. 23; Doc. 6-14, p. 44; Doc. 6-15, p. 24). Dr. Bivona prescribed Lyrica for radiculopathy and Robaxin for muscle spasms, and Ms. Wade took Norco for pain. (Doc. 6-13, p. 12). Dr. Tumminello noted reduced sensation in Ms. Wade's ankles on August 10 and 26, 2020 and diagnosed moderate polyneuropathy. (Doc. 6-10, p. 14). Dr. Reddy found that Ms. Wade had decreased sensation in her legs. (Doc. 6-13, pp. 131-32).

Ms. Wade's moderate lumbar stenosis, spondylolisthesis at L3-4, retrolisthesis at L4-5 with instability, moderate to severe generalized interspace narrowing in her thoracic spine, and fibromyalgia support her claims of chronic pain. Ms. Wade's medical records show that she had decreased range of motion in her lumbar and cervical spine, moderate to severe weakness in her hips, tenderness to palpation in her cervical and lumbar spine and SI joint, and more than 11 "tender

trigger points" in her back, neck, shoulders, and extremities. (Doc. 6-3, pp. 9-10; Doc. 6-8, p. 30; Doc. 6-9, pp. 43, 70, 138-39; Doc. 6-13, pp. 9-10; Doc. 6-15, pp. 6, 16). Substantial evidence does not support the ALJ's findings regarding the limiting effects of Ms. Wade's chronic pain.

Based on Ms. Wade's non-compliance with prescribed treatments, the ALJ discounted her reports of the limiting effects of her pain. (Doc. 6-3, p. 23). The ALJ noted that Ms. Wade did not fill all prescriptions for medications in 2022. (Doc. 6-3, p. 28). The ALJ stated that Ms. Wade received "minimal treatment" for her fibromyalgia symptoms and sought "no treatment from a specialist" for fibromyalgia. (Doc. 6-3, p. 27). Ms. Wade's lack of insurance helps explain why she did not seek treatment with a fibromyalgia specialist and why she may not have filled all prescriptions. Ms. Wade testified at the hearing that her COBRA medical insurance ceased about a year before the hearing in June 2022. (Doc. 6-3, p. 72-73). Ms. Wade testified that her "insurance ran out" shortly after Dr. Tumminello diagnosed fibromyalgia. (Doc. 6-3, p. 67). Ms. Wade testified that she could not find affordable medical insurance and that she had depleted her savings. (Doc. 6-3, pp. 79-80). The record shows that Ms. Wade's lack of insurance limited her treatment options. (Doc. 6-14, p. 38) (Dr. Bivona noted that his medical examination was limited because Ms. Wade could not afford further testing); (Doc. 6-15, p. 52) (CRNP Seals noted that Ms. Wade was waiting for insurance to follow up with

rheumatology, neurology, and orthopedics).   The ALJ did not account for this evidence.  *See* SSR 16-3p (stating that the ALJ "will not find an individual's symptoms inconsistent with the evidence in the record" for failure to seek medical treatment "without considering possible reasons" for her failure to seek treatment, including "that the individual may not be able to afford treatment and may not have access to free or low-cost medical services").

When a claimant cannot afford prescribed treatment, she is excused from noncompliance.   *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).  Regarding Ms. Wade's lack of insurance, the ALJ stated that "there [was] no indication that [Ms. Wade] requested financial assistance and was turned down." (Doc. 6-3, p. 26).  But "[t]he burden of proving unjustified noncompliance is on the Commissioner." *Hunter v. Berryhill*, No. 4:20-CV-00858-MHH, 2022 WL 989022, at *12 (N.D. Ala. Mar. 31, 2022) (citing *Dawkins*, 848 F.2d at 1213).  Therefore, the ALJ misplaced the burden regarding noncompliance.

For these reasons, substantial evidence does not support the ALJ's pain standard findings.

## CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence does not support the ALJ's decision.  Accordingly, the Court reverses the decision of the

Commissioner and remands this case for further proceedings consistent with this opinion.[29]

      **DONE** and **ORDERED** this March 24, 2025.

                                            _____

                                            **MADELINE HUGHES HAIKALA**
                                            UNITED STATES DISTRICT JUDGE

---

[29] Given this remand, the Court will not address the other issue Ms. Wade raised in her brief.